JOHN. FRED SNOWDALE

*vs.*

THE UNITED BOX BOARD AND PAPER COMPANY.

Somerset.    Opinion June 27, 1905.

*Master and Servant.    Negligence.    Degree of Care to be Exercised by Master.*
*Master not an Insurer against Injury.*

The legal standard governing a master's duty is that of ordinary care with respect to the exigencies of the situation. What precautions and safeguards, what degree of vigilance and foresight would meet the requirements of ordinary care in a given case, must be determined by reference to the conduct of ordinarily prudent and careful men under like circumstances. In all situations the degree of care exercised must be equal to the emergency.

The relation of master and servant does not impose upon the master the obligation to guarantee that the servant will never sustain any injury in discharging the duties of his employment. The master does not undertake to insure the servant against all liability to accident.

On motion by defendant.    Sustained.

Action on the case to recover damages for personal injuries sustained by the plaintiff and caused by the alleged negligence of the defendant. At the trial in the court of the first instance, the plaintiff recovered a verdict of $990.00, and thereupon the defendant filed a general motion to have the verdict set aside.

The facts, so far as material, are stated in the opinion.

*Forrest Goodwin,* for plaintiff.

*Harvey D. Eaton,* for defendant.

SITTING: WISWELL, C. J., EMERY, WHITEHOUSE, STROUT, POWERS, JJ.

WHITEHOUSE, J.    In this case the plaintiff recovered a verdict of $990. for injuries sustained in the defendant's boiler room, August 29, 1903, by reason of the falling of a quantity of brick from the top

of the brick wall on the north side of the building. The case comes
to this court on a motion to set aside the verdict as against the law
and the evidence.

The brick wall in question formed the north side of the defendant's
mill at Fairfield. At the time of the accident, it was 198 feet long,
22 feet high and one foot thick. In this wall was an archway with
an opening 11 feet and 10 inches wide, through the center of which,
a carrier was constructed for the purpose of conveying waste fuel
from railroad cars outside to the furnaces in the boiler room. The
remaining space under the arch, not occupied by the carrier was
closed up with boards and two doors, one on each side of the carrier.

The building was constructed in 1881, and was originally pro-
vided with a wooden roof, but in 1895, the walls were raised about
three feet to their present height, the old roof removed and a new
one of corrugated iron, with steel frame, substituted for the wooden
one. The frame work of the new roof was composed of beams and
rafters extending over and across the building with purlins or ribs
running lengthwise. One of these steel purlins was laid in the top
of the wall as a plate for the support of the ends of the rafters, and
it was so embedded in the brick and mortar, and the wall so built
up under the roof, that the top of it came in contact with the corru-
gated iron covering. The bricks were properly laid in cement mor-
tar by skilled laborers, working under competent supervision, and the
wall when originally built had every appearance of being a structure
of solid and enduring masonry. It was not in controversy that two
cracks or seams afterwards appeared above the archway, each starting
about a foot from the end of the arch and intersecting the other at a
point nearly over the center of it, about five feet from the top of the
wall. The existence of these seams in the old wall was accounted
for by the suggestion that the wooden support upon which the arch
was originally constructed, was probably removed before the mortar
became firmly set in the joints of the brick work thus causing a
slight contraction and consequent settling of the arch. But the
courses of brick above these seams, excepting those which fell from
the top, were in regular line, solid and unmoved; and in view of
the undisputed facts relating to the conditions existing at the time

the brick fell, considered in connection with the reasonable testimony of expert builders, the inference is justified that these cracks or seams above the archway, had no connection whatever with the accident caused by the falling of the brick from the top courses. The explanation of the loosening and falling of those brick which seems to have been accepted by both parties as the only rational and probable one, was that the steam in the boiler room condensed and the water ran down on the under side of the iron roof in the winter time and coming in contact with the steel purlin on the top of the wall, worked its way into the brick work; and that the action of the frost was then such as to heave the brick gradually out of place, so that the slight vibration resulting from the operation of the carrier or the railroad car, caused them to topple over.

The accident occurred, it has been noted, on the 29th of August, 1903, and the plaintiff insists that inasmuch as the destructive agency of the frosts, must have been progressing every winter after the iron roof was put on, and in any event, several months had elapsed after the frosts of the last winter had ceased to act, there had been abundant opportunity for the defendant to discover the dislodged and dangerous condition of those brick, if the walls of the building had from time to time been properly inspected and examined.

On the other hand, the defendant says, in the first place, that the top of the brick wall under the eaves of the building, was not exposed to ordinary observation at the point in question for the reason that it was remote and dimly lighted, that smoke and soot had still further obscured it, and a ten inch water pipe suspended under the beams only twelve inches from the wall, formed another obstruction to a clear view of it. Hence, as an outward movement of only two inches was required to cause the upper courses to topple and fall, the actual condition of the brick was not in fact discovered by any inspection made in behalf of the defendant prior to the accident, and was not in fact known to or suspected by any agent of the company. It is furthermore confidently argued that as no similar accident had ever before happened either on this mill or any other, to the knowledge of any of the parties or witnesses in this case, and as the scene of it was in a boiler room where it would not occur to the mind of

even the most thoughtful and prudent man to look for frost or its effects, the defendant had no warning of the possibility of such a defective condition of the wall, no reasonable ground to anticipate such a result or the existence of such a cause, or to suspect that there was any necessity for an examination of that part of the wall. It is earnestly contended therefore that the defective condition complained of was not only unknown to the defendant in fact, but that it could not have been ascertained by the exercise of such reasonable care, diligence and foresight as ordinarily prudent men usually exercise under like circumstances.

The plaintiff sought to establish the defendant's liability on the ground of negligence. He claimed that there was a breach of duty on the part of the defendant in failing to exercise ordinary care to provide a reasonably safe and suitable place in which, by the exercise of due care on his own part, he could perform the service required of him without liability to other injuries than those resulting from simple and unavoidable accidents. There was no substantial controversy in relation to material facts. It was the duty of the jury, guided by the well settled rules of law applicable to the situation to draw the appropriate inference from essentially undisputed facts. The existence of the relation of master and servant between the parties did not impose upon the defendant the obligation to guarantee that the plaintiff would never sustain any injury in discharging the duties of his employment. The defendant did not undertake to insure the plaintiff against all liability to accident. The legal standard governing the defendant's duty was that of ordinary care with respect to the exigencies of that situation. What precautions and safeguards, what degree of vigilance and foresight would meet the requirements of ordinary care in a given case, must be determined by reference to the conduct of ordinarily prudent and careful men under like circumstances. In all situations the degree of care exercised must be equal to the emergency.

When the conduct of the defendant is examined in the light of the situation as it existed at that time, and tested by the amount of care usually bestowed by the ordinarily prudent man, under the same circumstances and conditions, unaided by the knowledge which comes

after the event, it is difficult to specify in what particular there was a failure of duty on the part of the defendant towards this plaintiff. In the original construction as well as in the subsequent repair and improvement of the building, the defendant's managers, acting under the ordinary influence of the motives of self interest which stimulate men of affairs to erect suitable and permanent structures and avoid liability to the payment of damages, appear to have employed intelligent contractors and builders of large experience, under whose supervision, the labor of competent and skillful workmen was performed. Those who built the mill as well as those who subsequently raised the walls and placed the iron roof upon them, testify without reservation to the thoroughness of the entire work. One of the most experienced and competent of contractors and builders in the state, testified that with the knowledge of steel roofs then possessed by builders in this climate, the structure "was as good as could be;" and all of the expert builders who testified upon this branch of the case declare in effect that it never would have occurred to them that there would have been sufficient water and frost on the top of that wall in the boiler room to produce the result found in this case. Numerous and familiar instances may be recalled of substantial brick buildings, the control of which has been exercised for half a century by careful and prudent managers, not only without any critical inspection of the top of the brick walls, but without the occurrence of any incident calculated to put a prudent man upon inquiry respecting their safety. In the case at bar, nothing had transpired to awaken any suspicion of the source of danger found to exist in this case, or to suggest the necessity of an examination of the top courses of brick in walls apparently solid and substantial. The conclusion is irresistible that the care exercised by the defendant in the management of its mill was such as is usually exercised by ordinarily prudent people under like circumstances, and that there was no breach of duty on its part towards the plaintiff with respect to the accident in question. It is accordingly the opinion of the court that the conclusions drawn by the jury were not warranted by the facts, and that their verdict must be set aside as against the law and the evidence.

*Motion sustained. Verdict set aside.*